IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TRACY O. and DANTE O., individually and as guardians of SYDNEY, a minor,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, and ANTHEM UM SERVICES INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:16-cv-422-DB<br><br>District Judge Dee Benson |

Before the court are Defendants' and Plaintiffs' cross Motions for Summary Judgment (Dkt. Nos. 18 and 22.) The court held a hearing on the Motions on May 15, 2017. Plaintiffs were represented at the hearing by Brian King. Defendants were represented by Jessica Wilde and Timothy Houpt. At the conclusion of the hearing, the court took the motions under advisement. Now being fully advised, the court issues the following Memorandum Decision and Order.

## FACTS

This is an ERISA action in which Plaintiffs seek payment under a group health benefit plan for their daughter, S.O.'s, 10-month stay at a residential treatment facility in Utah. (Complaint, ¶¶ 1-7; Answer, ¶¶ 1-7.)

*S.O.'s Treatment History*

S.O. has a long history of mental health diagnoses and treatment. (*See* R.[1]0064-0172.)[2] As an infant and toddler, S.O. had various physical and behavioral problems. (R. 0066-68.) Due to behavioral problems, S.O. began seeing a psychiatrist, Dr. Todd Hutton, when she began elementary school. (*Id.*) Dr. Hutton diagnosed S.O. with attention deficit disorder at one time and later diagnosed her with bipolar disorder. (*Id.*) S.O. was prescribed a variety of medications related to these diagnoses at a young age. (*Id.*)

Throughout elementary school, though S.O. continued to exhibit behavioral problems, her symptoms diminished over time due to family, school, and clinical support. (R. 0068.) However, in middle school, S.O.'s symptoms began to worsen. (*Id.*) At the beginning of her eighth grade year, S.O. began seeing a psychiatrist, Dr. Linda Woodall. (*Id.*) Dr. Woodall observed that S.O. exhibited psychotic symptoms, mood swings, and dangerous behavior, including binge eating, purging, restricted eating, severe weight loss, cutting, and hypersexuality. (R. 0475.) S.O. ultimately could not cope with daily school attendance and completed her eighth grade school work at home, under the supervision of her mother. (R. 0069.) The summer following 8th grade, S.O. attempted to commit suicide by overdosing on a prescription medication. (*Id.*)

---

[1] The Appendix of Exhibits filed with Defendants' Motion for Summary Judgment (Dkt. No. 17) constitutes the Record on Appeal. Those documents are Bates labeled ANTHEM 0001 through ANTHEM 2620. The court refers to those documents as R. 0001 through R. 2620.

[2] For much of S.O.'s early medical history, Plaintiffs rely on their appeal letter submitted to Anthem Grievance and Appeals on December 30, 2013. Although some of this information is supported by Exhibits, other portions are factual submissions made by the Plaintiffs themselves. For purposes of this Motion, the court accepts the facts in Plaintiffs' appeal letter as true.

Following her suicide attempt, Dr. Woodall recommended a special school for S.O. where she would be with other children with similar issues. (*Id.*) Although S.O. did better in the new school, she continued to have behavioral problems, including problems with peer relationships, binging, purging, and cutting herself. (*Id.*) S.O. also began to experience audio and visual hallucinations, for which Dr. Woodall prescribed medication. (R. 0070.) Around the middle of S.O.'s ninth grade year, in early 2012, Dr. Woodall recommended that S.O. be placed in a long term residential treatment facility in Utah. (*Id.*) Plaintiffs decided against in-patient treatment at that time. (*Id.*)

In November 2012, during her ninth grade year, S.O. began to see a school therapist, Ms. Carol Maskin, MFT. (*Id.*) Ms. Maskin observed that S.O. continued to binge, purge, and cut herself, and expressed frequent suicidal thoughts. (*Id.*) Ms. Maskin further observed that S.O. had engaged in self harm, including attempting to carve a "U" into her leg. (*Id.*) Concerned with these behaviors, Ms. Maskin recommended an in-patient treatment program for S.O. (*Id.*)

On or about January 14, 2013, S.O. entered the Center for Discovery, a medically monitored residential treatment facility in Lakewood, California. (*Id.*) S.O. did not do well at the Center for Discovery and left the program in early March 2013. (*Id.*) Following her release from the Center for Discovery, S.O. began a partial treatment program at BHC Alhambra Hospital, which provided day treatment facilities. (R. 0071.) During her treatment, S.O. was admitted on an in-patient basis for a short period of time in early April 2013. (*Id.*)

Following her release from BHC Alhambra on April 2, 2013, S.O. continued to see Ms. Maskin and Dr. Woodall regularly on an outpatient basis. (*Id.*) By June 2013, Ms. Maskin recommended that Plaintiffs never leave S.O. unsupervised. (R. 0074.) At that time, Ms. Maskin

3

observed that S.O. was no longer able to commit to a "suicide contract" in which S.O. would agree not to engage in self harm. (*Id.*) Accordingly, Ms. Maskin strongly recommended placement in a long-term facility in which S.O. could be removed from triggers and distractions that had contributed to her conditions. (*Id.*)

In response to recommendations made by Dr. Woodall and Ms. Maskin, as well as Plaintiffs' observations of their daughter's condition, Plaintiffs decided to place S.O. in a residential treatment facility. (*Id.*) Plaintiffs selected New Haven Residential Treatment Center ("New Haven"), an in-patient residential treatment facility in Utah. (*Id.*) In connection with S.O.'s application to New Haven, a psychiatric evaluation was completed by Rick Biesinger, Psy. D., NCC, over a period of three visits in April 2013. (R. 144-56; Dkt. No. 38.) Dr. Biesinger noted that S.O. reported "numerous psychological difficulties", including anxiety, nightmares, trembles, nausea, fear, ritualistic behaviors, and inflexible habits. (R. 0145.) S.O. also reported "numerous symptoms consistent with a mood disorder" and hyper-sexuality. (*Id.*) Dr. Biesinger also noted that, at the time of her interview, S.O. "denied having any suicidal ideation" and reported that she attempted suicide "like four years ago" and denied any other attempts. (R. 0148.) S.O. further reported that "she started cutting about four years ago" and that she continued to cut herself "maybe not every day, but a lot." (*Id.*) When asked when she last cut, S.O. reported that it had been about two months ago. (*Id.*) Dr. Biesinger observed that S.O. "related well to the examiner and there were no indications of hostility or bizarre thought content." (*Id.*) Based on his observations, Dr. Biesinger diagnosed S.O. with generalized anxiety disorder, major depressive disorder (recurrent, moderate), borderline personality tendencies, and bulimia nervosa. (R. 0155.) Dr. Biesinger further stated that "[t]he results of [S.O.'s] testing indicate that

residential treatment is warranted and recommended" and that "[S.O's] suicidal ideation should be carefully monitored." (*Id.*)

On July 2, 2013, S.O. was admitted to New Haven. (*Id.*) S.O. continued to receive counseling throughout her stay at New Haven. (R. 0158-72.) S.O.'s counselor, Sarah Engler, LCSW, noted that S.O. continued to experience anxiety, obsessive-compulsive symptoms, and some hallucinations in treatment. (*See* R. 0161, 0166-69.) Early in her stay at New Haven, S.O. expressed some desires to hurt herself, such as hitting her head against a wall. (R. 0158.) However, during her time at New Haven, S.O. was not reported to have engaged in cutting, suicide attempts, or violent behavior towards others. (R. 0158-72.)

*Plan Provisions*

S.O.'s father, Plaintiff Dante O, was an employee of California Commerce Club, Inc., which sponsored a fully-insured group health benefit plan under ERISA. (Compl., ¶¶ 3, 5.) The group health benefit plan for the applicable time period includes the "Group Benefit Agreement," which is primarily comprised of administrative pages, and which expressly incorporates "all Combined Evidence of Coverage and Disclosure Forms" applicable to the group (collectively, the "Plan"). (R. 2527.)

The Plan provides that "**THE BENEFITS OF THIS PLAN ARE PROVIDED ONLY FOR THOSE SERVICES THAT WE DETERMINE TO BE MEDICALLY NECESSARY**." (R. 1780.) The Plan further provides a "Utilization Review Program" employed by Anthem to determine whether services are medically necessary:

> The utilization review program evaluates the medical necessity and appropriateness of care and the setting in which care is provided. You and your *physician* are advised if we have determined that services can be safely provided in an outpatient setting, or if an inpatient *stay* is recommended. Services that are

*medically necessary* and appropriate are certified by us and monitored so that you know when it is no longer *medically necessary* and appropriate to continue those services.

(R. 1831.)

In determining whether a member qualifies for residential in-patient treatment,[3] there are certain admission criteria that must be met, as defined in the Psychiatric Subacute Residential Treatment Center section of the Behavioral Health Necessity Criteria. (R. 1947-48.) In order to qualify for residential psychiatric treatment the following criteria must apply:

1. The Covered Individual is manifesting symptoms and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting.
2. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the Covered Individual is in the residential facility.
3. There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the Covered Individual will be able to return to outpatient treatment.

(*Id.*)

When clinical information provided meets the criteria for medical necessity and residential treatment, the case may be certified by the utilization review or care manager. (R. 1944.) If the criteria do not appear to be met, the case "must be sent to a psychiatrist reviewer/peer clinical reviewer for an assessment of the case." (*Id.*) "The psychiatrist reviewer/

---

[3] **Residential Treatment** – Residential treatment is defined as specialized treatment that occurs in a residential treatment center. Licensure may differ somewhat by state, but these facilities are typically designated residential, subacute, or intermediate care facilities and may occur in care systems that provide multiple levels of care. Residential treatment is 24 hours per day and requirement a minimum of one physician visit per week in a facility based setting. Wilderness programs are not considered residential treatment programs.

(R. 1945.) Residential treatment is distinct from other levels of care defined in the Plan, including Acute Inpatient Hospitalization, Intensive Outpatient Treatment, and Outpatient Treatment. (R. 1945-46.)

peer clinical reviewer should use the behavioral health medical necessity criteria in reviewing a requested service for consistency, but must also use his or her discretion and professional judgment to the criteria when indicated by a member's unique clinical circumstances." (*Id.*)

If a member is dissatisfied with a decision regarding coverage, the member may appeal by submitting a "grievance" to Defendants. (R. 1743, 1886.) Following a denial of benefits, a member may also request an independent medical review conducted by the California Department of Managed Health Care. (R. 1743-48, 1886-91.) During the independent review, a medical specialist "will make an independent determination of whether or not the care is *medically necessary*." (R. 1748, 1891.) If the independent reviewer "determines the service is medically necessary, [Defendants] will provide benefits for the health care service." (*Id.*)

*Request for Certification and Filing of Grievance*

In early July 2013, Plaintiffs requested certification from Defendants regarding payment for S.O.'s stay at New Haven. (R. 0080.) On July 9, 2013, Defendants denied certification, stating that "the service does not meet the criteria for 'medical necessity' under your description of benefits." (*Id.*) The denial stated that a medical review had been completed by Timothy Jack, M.D., who had determined that "[t]he information your provider gave us does not show that this is medically necessary. You do not require 24 hour supervision while you are treated for this. You can be safely treated with outpatient services." (*Id.*) The letter further stated that "[t]his review was conducted by Richard Cottrell, DO." (*Id.*)

Dr. Cottrell conducted a review by telephone with S.O.'s psychiatric treatment provider at New Haven, Sarah Engler, UR, on July 8, 2013. (R.437-39.) In that call, Dr. Cottrell confirmed that S.O. had been diagnosed with bipolar disorder, OCD, eating disorder, and the

7

possibility of ADHD and Autistic Spectrum. (R. 439.) Dr. Cottrell further recorded that S.O. "presents with depressed mood", "is compliant at this point", and "has passive death wishes (no plan or intent reported)." (*Id.*) Dr. Cottrell also noted that S.O. "does not appear to be an imminent danger to self or others" and that there had been "[n]o recent threatening or physically aggressive [behaviors] reported." (*Id.*) As a result, Dr. Cottrell determined that the level of care necessary for S.O. at that time was a Psychiatric Intensive Structured Outpatient Program.[4] (*Id.*) Accordingly, Dr. Cottrell determined that in-patient treatment at New Haven was not medically necessary. (*Id.*) This additional information and analysis obtained and recorded by Dr. Cottrell was not provided to Plaintiffs at the time their request for certification was denied. (*see* R. 0080.)

A second physician, Marina Bussell, M.D., also reviewed Plaintiffs' certification request. (R. 441-45.) After three attempts to contact Ms. Engler, Dr. Bussell based her review on written clinical information previously provided. (R. 442-44.) Based on this information, Dr. Bussell also concluded that residential treatment was not medically necessary, stating:

> You went to this program because your behavior could be harmful to yourself or others. You have not caused serious harm to anyone. You have not harmed yourself to such a degree that has caused serious medical problems. You have not had recent treatment for this in a structured outpatient program. You are also likely to benefit from structured outpatient treatment.

(R. 444.)

---

4     **Intensive Outpatient Treatment** – Intensive outpatient is a structured, short-term treatment modality that provides a combination of individual, group and family therapy. Intensive outpatient programs meet at least three times per week, providing a minimum of three (3) hours of treatment per session. Intensive outpatient programs must be supervised by a licensed mental health professional. Intensive outpatient treatment is an alternative to inpatient or partial hospital care and offers intensive, coordinated, multidisciplinary services for Covered Individuals with an active psychiatric or substance related illness who are able to function in the community at a minimally appropriate level and present no imminent potential for harm to themselves or others.

(R. 1946.)

In a letter dated December 30, 2013, Plaintiffs appealed the decision denying payment for the expenses incurred at New Haven. (R. 452-561.) In support of their appeal, Plaintiffs submitted letters from Dr. Woodall and Ms. Maskin, clinical notes and records from S.O.'s care providers at New Haven, and copies of the applicable plan provisions. (R. 475-561.) In her letter, dated October 21, 2013, Dr. Woodall outlined S.O.'s psychiatric history, including that S.O. had "cut herself, overdosed, has had indiscriminant sex, binge eats, and continues to be bullied" and that "[s]he believes that people are conspiring against her." (R. 475.) Dr. Woodall further noted that S.O. had "been hospitalized and sent to short term residential treatments in the past. She has had multiple therapists and outpatient DBT." (*Id.*) Dr. Woodall concluded that S.O. was "clearly a very disturbed young woman who has been difficult to manage, both medically and behaviorally with traditional care. Her Schizoaffective disorder, bipolar type, dangerous behavior, and eating disorder warrant long-term residential treatment." (*Id.*) Dr. Woodall did not analyze S.O.'s condition with respect to the Plan criteria for in-patient treatment, discuss the necessity of such treatment, or address the viability of other lower levels of treatment. (*Id.*)

Ms. Maskin, in a letter dated December 2013, also described S.O.'s troubled psychiatric history, including that S.O. "would engage in self-injurious behavior", such as "binging and purging", "cut[ting] herself", "engag[ing] in risky behaviors of inappropriate sexual conduct while online." (R. 477.) Ms. Maskin stated that she was most concerned with S.O.'s "constant suicidal ideation" and noted that S.O "could no longer commit to a suicide contract[.]" (*Id.*) She concluded by describing her recommendation that S.O. be placed in a more intensive treatment program:

> By June [2013, S.O.] was extremely symptomatic and on a daily basis there was concern for her safety. I requested for parents to never have her unsupervised. I

9

> felt at this point in her treatment that she was in dyer (*sic*) need of more intensive treatment where all her multiple diagnoses could be addressed and based upon my experience working with adolescents, it was clear to me that [S.O.] would only get worse or even succeed at suicide. I strongly recommended again to her parents that she needed to be in a long-term facility where she was removed from the triggers and distractions that have so long been a part of her battle and have disabled her.

(R. 478.) Ms. Maskin did not analyze S.O.'s condition with respect to the Plan criteria or opine as to whether intensive outpatient treatment could adequately address S.O.'s symptoms. (*Id.*)

The New Haven clinical notes and medical records provided by Plaintiffs in their appeal letter were consistent with the representations made by Ms. Engler to Dr. Cottrell during their July 2013 phone call, as well as the clinical notes reviewed by Dr. Jack, Dr. Cottrell and Dr. Bussell during their review of Plaintiffs' request for certification. (R. 452-561.)

On January 29, 2014, another physician, Donald Mayes, M.D., reviewed Plaintiffs' appeal. (R. 446-50.) Dr. Mayes conducted his review based on written clinical information. (R. 449.) Dr. Mayes noted S.O.'s multiple diagnoses and treatment history. (*Id.*) Although S.O. had reported "OCD symptoms and anxiety" throughout her stay at New Haven, Dr. Mayes noted that her clinical notes "indicate[d] no signs of psychosis" or "Suicidal Homicial ideation's (*sic*)." (*Id.*) Dr. Mayes concluded that "[d]ue to the nature and chronicity of patient's symptoms, I do not see a reasonable expectation that the condition and illness will be stabilzed (*sic*) or improved in a short term subacute [Residential Treatment Center Level of Care] and that the symptoms require 24 hour care in a structured setting." (*Id.*) Accordingly, Dr. Mayes recommended Psychiatric Partial Hospitalization[5] as the appropriate alternative level of care. (*Id.*)

---

5     **Partial Hospitalization –** Partial hospitalization (called day treatment) is a structured, short-term treatment modality that offers nursing care and active treatment in a program that is operable at a minimum of six (6) hours per day, five (5) days per week. Covered Individuals must attend a minimum of 6 hours per day when participating in a partial hospitalization program. Covered

In a letter dated January 31, 2014, Defendants notified Plaintiffs that their appeal had been denied:

> Our Medical Reviewer, Donald Mayes, MD, Board Certified in Psychiatry has determined: We cannot approve the request for admission to residential treatment as of July 2, 2013. The information your provider gave us does not show that this was medically necessary. You went to this program because your behavior could be harmful to yourself or others. This had been going on for some time. You had not caused serious harm to anyone. You had not harmed yourself to such a degree that had caused serious medical problems. You did not require 24 hour supervision while you were treated for this. You could be safely treated with outpatient services. We based this decision on the health plan (2013 Behavioral Health Medical Necessity Criteria for this service Psychiatric Subacute Residential Treatment Center (RTC)).

(R. 607.) The letter stated that it was a "final decision and your grievance rights with us are exhausted." (R.608.) However, it informed Plaintiffs that they could request an Independent Medical Review through the California Department of Managed Health Care ("DMHC"), and provided information with respect to requesting an independent review. (R. 609-11.)

*Independent Medical Review*

In a letter dated July 23, 2014, Plaintiffs requested an independent medical review by the DMHC of Defendants' denial of payment. (R. 646-53.) Maximus is under contract with DMHC to independently review medical records, employ health care professionals and decide if the care requested is or is not medically necessary. (R. 1615.) Defendants sent Maximus all of S.O.'s medical records on August 13, 2014, including two letters from Plaintiffs. (R. 1264-1529.)

---

> Individuals are not cared for on a 24-hour day basis, and typically leave the program each evening and/or weekends. Partial hospitalization treatment is provided by a multidisciplinary treatment team, which includes a psychiatrist. Partial hospitalization is an alternative to acute inpatient hospital care and offers intensive, coordinated, multidisciplinary clinical services for Covered Individuals that are able to function in the community at a minimally appropriate level and do not present an imminent potential for harm to themselves or others.

(R. 1944-45.)

In a letter dated August 29, 2015, Plaintiffs were informed by DMHC of Maximus's decision that "the services at issue were not medically necessary for treatment of the enrollee's medical condition" and that Maximum had "decided that Anthem Blue Cross of California's denial of the services at issue should be Upheld." (R. 1615.) Maximus certified that its decision was made by an independent physician, a board-certified practicing psychiatrist, with no affiliation with Defendants. (R. 1616.)

With its determination letter, Maximus included a report from the reviewing physician. (R. 1617-20.) The report stated that the physician had reviewed S.O.'s medical records dated 5/28/13 through 5/2/14, letters from Plaintiffs dated 12/30/13 and 7/23/14, the letter from Dr. Woodall, and the letter from Ms. Maskin. (R. 1617.) The report related in detail S.O.'s psychiatric medical history. (R. 1618-19.) In an "Analysis and Findings" section, the reviewing physician provided the recommended basis for upholding Defendants' denial of benefits:

> The residential treatment center (RTC) services provided from 7/2/13 through 5/2/14 were not medically necessary for treatment of the patient's medical condition. This patient has a complicated psychiatric history. From a very early age she demonstrated anxiety, obsessive compulsive symptoms, mood dysregulation, learning disability, self-mutilation, and eating disorder. She also has a history of one suicide attempt with Seroquel. At the time of admission, the patient was diagnosed with bipolar disorder most recently depressed, OCD, eating disorder NOS, generalized anxiety disorder, rule out *ADHD,* and autistic spectrum disorder. She denied suicidal or homicidal ideation, plan, or intent. Her vital signs were stable and there was no psychotic ideation in any modality.
>
> Over the course of the patient's residential stay she attended school and maintained good grades while under stress. She worked on issues such as gaining insight, processing and accepting her emotions, taking responsibility for her behavior, and setting boundaries. She continued to experience feelings of depression and anxiety, and her OCD symptoms fluctuated with episodes of worsening. She was not however, manifesting symptoms and behaviors beyond her baseline at home which represented a deterioration that could not be managed outside of a 24-hour structured setting. The patient had a supportive home environment. She underwent medication changes which were tolerated well and

> did not require a residential setting. She participated in treatment and was cooperative. During her residential stay the patient was not demonstrating ongoing active suicidal behavior, self-harm behavior, ongoing danger to others, or experiencing a grave disability. While there were reports of ongoing passive suicidal ideation, the records provided do not demonstrate that the patient was actively suicidal with intent or plan to harm herself during the period at issue. Given this, the patient did not require 24-hour supervision in a residential setting and could have safely been treated at a lower level of care. Based on the medical literature cited above and the documentation submitted for review, the RTC level of care provided from 7/2/13 through 5/2/14 was not medically necessary for treatment of the patient's medical condition.

(R. 1620.)

Consistent with Maximus's determination, the DMHC informed Plaintiffs that because "the independent provider determined that the services you requested were not medically necessary[,]…the Department cannot require your health plan to provide these services, or reimburse you for the services already received." (R. 1613.) On April 19, 2016, Plaintiffs commenced this action, alleging that the denial of benefits for S.O.'s stay at New Haven from July 2, 2013 through May 2, 2014 was a breach of contract that caused Plaintiffs to incur expenses in excess of $150,000. (*See* Complaint.)

## DISCUSSION

A denial of ERISA benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Where the plan gives the administrator discretionary authority, however, 'we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *LaAsmar*

*v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 795 (10th Cir.2010)). The Tenth Circuit applies a "comparatively liberal" construction of "language to trigger the more deferential standard of review under ERISA." *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002).

Her, the Plan delegates discretionary authority to the plan administrator. As discussed above, the Group Benefit Agreement expressly incorporates "all Combined Evidence of Coverage and Disclosure Forms" applicable to the group. (R. 2527.)[6] The Combined Evidence of Coverage and Disclosure Form for the applicable time period prominently states: "**THE BENEFITS OF THIS PLAN ARE PROVIDED ONLY FOR THOSE SERVICES THAT WE DETERMINE TO BE MEDICALLY NECESSARY**." (R. 1780, emphasis in original.) It further details Utilization Review Requirements to be used when determining medical necessity, the very steps taken by Defendants in this case. (R. 1832-37.) That process clearly establishes: "We will determine if services are *medically necessary* and appropriate. For inpatient *hospital* and *residential treatment center* stays, we will, if appropriate, specify a specific length of *stay* for services." (R. 1836.) These clear delegations of discretionary authority are sufficient to trigger the arbitrary and capricious standard of review.

"Under this arbitrary-and-capricious standard, our review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *LaAsmar v.*

---

[6] Plaintiffs argue that the full plan is not included in the Record and, as such, Defendants have failed to carry their burden to show that discretionary authority has been delegated in the plan documents themselves. *See LaAsmar*, 605 F.3d at 796 (the "burden to establish that this court should review its benefits decision … under an arbitrary-and-capricious standard" falls upon the plan administrator). The court rejects Plaintiffs' argument, as the Group Benefit Agreement, along with the Combined Evidence of Coverage and Disclosure Forms which are incorporated by reference, constitute the plan documents in this case. *See Eugene S.*, 663 F.3d 1131 (10th Cir. 2011) (noting that the court did not need to determine if a Summary Plan Description conflicted with the plan or was unsupported by the plan because "it *is* the Plan").

14

*Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins.* Plan, 605 F.3d 789, 796 (10th Cir. 2010) (internal citations omitted). Put another way, a plan administrator's decision will be upheld "unless it is not grounded on *any* reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (internal citations omitted). Plaintiffs argue that Defendants abused their discretion[7] because S.O.'s conditions and treatment met the criteria for residential treatment under the Plan and because Defendants failed to follow ERISA claim procedures and consider undisputed facts during their review and denial of coverage.

*The Determination that S.O. Did Not Meet the Plan Criteria for Residential Treatment*

Defendants' decision that S.O. did not meet the criteria for residential treatment under the Plan was not an abuse of discretion. In order to qualify for residential psychiatric treatment the following criteria must apply:

1. The Covered Individual is manifesting symptoms and behaviors which represent a deterioration from their usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting.
2. The social environment is characterized by temporary stressors or limitations that would undermine treatment that could potentially be improved with treatment while the Covered Individual is in the residential facility.
3. There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the Covered Individual will be able to return to outpatient treatment.

(R. 1947.) Defendants reasonably concluded that these criteria were not met.

---

[7] Plaintiffs argue that the standard of review should be *de novo*, but alternatively argue that Defendants' actions and inactions constitute an abuse of discretion.

With respect to the first criteria, although Ms. Maskin described some deterioration of S.O.'s symptoms and behaviors prior to her entry into New Haven, (R. 478), none of S.O.'s treatment providers offered an opinion that S.O.'s symptoms and behaviors represented a deterioration from their usual status. Rather, her care providers indicated that S.O.'s behaviors and symptoms were consistently troubling from the time that she began middle school. (*See, e.g.,* R. 475, reciting S.O.'s numerous symptoms in the past and present, and noting that S.O. had "been hospitalized and sent to short term residential treatments in the past" and had consistently had "multiple therapists and outpatient DBT.") Furthermore, other than general recommendations that S.O. enter an inpatient program, S.O.'s treatment providers gave no indication or assurance that S.O.'s risk taking and self injurious behaviors could not be managed in an outpatient setting. (*See* R. 475-561.)

With respect to the third criteria, even assuming that S.O. had symptoms and conditions that required in-patient care, none of her treatment providers provided an opinion that "a short term, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care" such that S.O. would be able to return to outpatient treatment. Rather, S.O.'s treatment providers described a long history of mental health issues that were "difficult to manage, both medically and behaviorally with traditional care." (R. 475.)

Three physicians—Dr. Cottrell, Dr. Bussel, and Dr. Jack—reviewed S.O.'s medical records and treatment history at the time of her certification request and determined that residential in-patient treatment was not medically necessary. (*See* R. 439-447.) Another physician, Dr. Mayes, came to the same conclusion following Plaintiffs' grievance. (R. 607.) Those physicians analyzed the information provided by S.O.'s treating physicians and medical

16

history in concluding that S.O. did not meet the criteria. Their conclusions are further supported by the independent review conducted by Maximus on behalf of the California DMHC, which found that S.O. "did not require 24-hour supervision in a residential setting and could have safely been treated at a lower level of care." (R. 1620.) Defendants' determination that S.O. did not meet the Plan criteria for residential treatment was not arbitrary or capricious.

Furthermore, even under *de novo* review, Plaintiffs have failed to show by a preponderance of the evidence that the residential treatment criteria were met. Even accepting all of Plaintiffs' factual assertions as true, none of S.O.'s treatment providers analyzed her condition with respect to the residential treatment factors. A review of the submissions of Dr. Woodall, Ms. Maskin, and Dr. Biesinger demonstrates that S.O. had a long history of mental and behavioral health symptoms and conditions, but does not demonstrate that her condition had deteriorated from its usual status or that a short in-patient stay would improve her symptoms. As such, Defendants reasonably concluded that S.O. did not meet the residential treatment criteria.

*Procedures of Review*

Plaintiffs further argue that Defendants failed to consider undisputed evidence in S.O.'s medical records when concluding that she did not qualify for residential in-patient treatment and that Defendants failed to meaningfully communicate with them, as required by ERISA. (Dkt. No. 23, p. 38-42.) A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Furthermore, "[a] plan administrator is required by statute to provide a claimant with the specific reasons for a claim denial." Here, Defendants have complied with those obligations.

In the initial denial of Plaintiffs' request on July 9, 2013, Defendants stated that "the service does not meet the criteria for 'medical necessity' under your description of benefits." (R. 574.) The denial also stated that a medical review had been completed by Timothy Jack, M.D., who had determined that "[t]he information your provider gave us does not show that this is medically necessary. You do not require 24 hour supervision while you are treated for this. You can be safely treated with outpatient services." (*Id.*) Defendants "based this decision on the health plan guidelines called 2013 Behavioral Health Medical Necessity Criteria for Psychiatric Subacute Residential Treatment Center (RTC)." In a second letter, dated July 12, 2013, Defendants provided additional information from Dr. Bussell: "The information your provider gave us does not show that this is medically necessary. You went to this program because your behavior could be harmful to yourself or others. You have not caused serious harm to anyone. You have not harmed yourself to such a degree that has caused serious medical problems. You have not had recent treatment for this in a structured outpatient program. You are also likely to benefit from structured outpatient treatment." (R. 582.) This letter similarly noted that Defendants "based this decision on the health plan (2013 Behavioral Health Medical Necessity Criteria for this service Psychiatric Subacute Residential Treatment Center (RTC))." (*Id.*)

Defendants' internal notes further demonstrate that the reviewing physicians[8], Dr. Cottrell, Dr. Bussell, and Dr. Jack, reviewed S.O.'s treatment history, including discussing her

---

[8] Plaintiffs also argue that Defendants violated ERISA by failing to "identify *any* reviewer for Anthem with appropriate medical expertise in *adolescent* psychiatry who ever reviewed the claim for Anthem." (Dkt. No. 23, p. 43.) Plaintiffs cite no Record evidence showing that the psychiatrists and physicians that evaluated S.O.'s treatment record did not have the requisite "appropriate training and experience" in the field in order to evaluate S.O. *See* 29 C.F.R. § 2650.503-1(h)(3)(iii). Plaintiffs also do not cite any case law standing for the proposition that only an adolescent psychiatrist may evaluate an adolescent. As such, the court does not have any basis to rule in Plaintiffs' favor on that point. The record evidence before the court demonstrates that board certified, licensed professionals in the field of mental health reviewed S.O.'s request and appeal.

18

current treatment with her care provider, Ms. Engler, at New Haven. The reviewers acknowledged S.O.'s troubled psychiatric history and self-injurious behaviors. (R. 437-39, 441-45, 446-50.) Even so, the reviewing physicians concluded that in-patient treatment was not medically necessary under the Plan criteria. (*Id.*) These determinations are not inconsistent with the evidence before the court regarding S.O.'s treatment history, as described by her treatment providers. Defendants did not disregard evidence in S.O.'s medical history when making the determination, and Defendants properly provided Plaintiffs with sufficient information regarding their determination. Under even a *de novo* standard of review, Plaintiffs have failed to show by a preponderance of the evidence that Defendants disregarded or improperly minimized information from S.O.'s treatment providers. And certainly under an abuse of discretion standard, the court cannot find that those determinations were "not grounded on *any* reasonable basis." *See Kimber*, 196 F.3d at 1098 (internal citations omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

DATED this 10th day of August, 2017.

BY THE COURT:

Dee Benson
United States District Judge